NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with
Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 26, 2011
Decided March 16, 2011

*Before*

WILLIAM J. BAUER, *Circuit Judge*

JOEL M. FLAUM, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 10-2010

| | |
|---|---|
| JOSEPH C. OUTLAW,<br>    *Plaintiff-Appellant,*<br><br>*v.*<br><br>MICHAEL J. ASTRUE,<br>Commissioner of Social Security,<br>    *Defendant-Appellee.* | Appeal from the United States District<br>Court for the Northern District of Illinois,<br>Eastern Division.<br><br>No. 08 C 4729<br><br>Sidney I. Schenkier,<br>*Magistrate Judge.* |

**O R D E R**

Joseph Outlaw claims that he is disabled by a combination of impairments, including depression, bipolar disorder, personality disorder, growths on the bottom of his feet, a torn rotator cuff, chronic joint pain, and carpal tunnel syndrome. He applied for supplemental security income and disability insurance benefits, but the Social Security Administration denied his applications at all stages, and a magistrate judge sitting by consent upheld that decision. We conclude that substantial evidence supports the ALJ's determination that Outlaw was not entitled to social security benefits and therefore affirm.

## I. Background

Outlaw, a 52-year-old veteran, applied for supplemental security income and social security disability insurance benefits in 2004, alleging that his disability began the previous year. His insured status expired in 2004. A hearing before an administrative law judge took place in 2007.

Outlaw received treatment for substance abuse, but the record shows that he adhered only periodically to prescribed treatment from at least 2002 until 2006. Outlaw was admitted to Edward Hines, Jr. VA Hospital twice for drug addiction, suicidal ideation, and low back and arthritic pain—first over a five-day period in 2004, and then again in 2006 when his stay lasted several months. After his 2004 hospitalization, he reported sporadic drug use, alcoholism, and homelessness, but he appears to have maintained periods of sobriety and a doctor recorded that he was in remission by 2007.

The record reflects Outlaw's struggle with psychological problems, although his doctors never agreed on a single diagnosis. From 2004 until 2007, different doctors both diagnosed and ruled out (and at times diagnosed again): depression and depression-related disorders, conditions related to drug dependency, personality disorder or related traits, and bipolar disorder. During an evaluation in 2006, a clinical psychologist suggested that Outlaw's drug abuse may stem from his psychological problems. In the last psychological evaluation that appears in the record before his ALJ hearing, a psychiatrist at Hines ruled out bipolar disorder and instead diagnosed "depressive disorder" and early sustained remission from drug dependency.

A consulting psychologist assessed Outlaw's functional capacity in August 2004. Her report recommended that Outlaw avoid public contact but suggested that he could work with coworkers and supervisors. Her report also determined that Outlaw could carry out "simple, routine work tasks" despite a limited ability to complete detailed instructions and moderate difficulties maintaining concentration, persistence, and pace; the report concluded that Outlaw had personality and substance-abuse disorders, yet they only mildly restricted his activities of daily living.

Although Outlaw asserted that his back troubles, arthritis, and carpal tunnel syndrome rendered him disabled in January 2003, imaging studies from 2003 and 2004 revealed only "mild" and "minimal" pathology in his back, as well as "facet degenerative joint disease" (a type of arthritis). Doctors performed regular exams for spinal and nerve disease, including numerous straight-leg-raise tests, but most results were negative. By fall 2003 he reported hip, shoulder, and leg pain; these complaints coincided with his stopping methadone treatments, and a doctor thought that some of this pain was caused by

withdrawal. In 2003 he was also diagnosed with "probable" carpal tunnel syndrome after reporting tingling and numbness in his hands; splints appear to have helped relieve his symptoms. By 2004 Outlaw began to complain of back, knee, and foot pain; he took prescribed medication to control his symptoms. Several doctors noted that Outlaw's heavy weight affected his back pain. And although a podiatrist diagnosed plantar fibromatosis on both feet in 2004 and Outlaw reported that pain prevented him from walking more than a few blocks, medical personnel disagreed over his ability to walk without limping or difficulty.

In August 2004 Dr. Margaret Stronska, an internist, examined Outlaw at the agency's behest and concluded that he suffered only from lower back pain. She recorded that Outlaw showed good strength and a full range of movement without pain in his shoulders, wrists, and knees, and good fine-motor control in his hands. Dr. Stronska also noted that Outlaw did not use a cane, that he walked 50 feet without help, and that he could stand up, bend, undress, and climb onto an examining table without difficulty. Despite these findings, Outlaw later that month sent the agency an "Activities of Daily Living Questionnaire" asserting that he could not walk without support; use his hands; or cook, clean, or stand without pain.

In fall 2004 an agency doctor concluded that Outlaw's combination of physical impairments was "non-severe." An agency examiner opined that Outlaw was not disabled, that he could perform unskilled work, and that he did not have a "vocationally significant physical limitation."

Outlaw reported similar complaints of pain from 2005 until 2007 despite consistent treatment, but imaging studies and physical exams continued to identify only mild spinal disease and arthritis. Outlaw's back pain, surmised another doctor, was related to a 50-pound weight gain after 2006. And notations in the record state that Outlaw used knee braces and a cane only periodically.

In May 2007 an ALJ heard sworn testimony from Outlaw. He first testified that his principal jobs involved manual labor requiring him to stand often and lift between 25 and 50 pounds; he alleged that he left his last job in 2002 due to problems with timeliness, chronic back pain, and deterioration of his mental health. Outlaw listed his alleged impairments, but incorrectly stated that he had been drug-free for a year (his medical records show that he tested positive for cocaine six months earlier). Despite shoulder problems, he conceded that he could lift ten pounds to shoulder's height. Outlaw also told the ALJ that for approximately three years, his pain interfered with sleep and most daily activities, including dressing himself. He asserted that he could not sit for longer than 45 minutes or walk farther than 30 feet without pain, and that he used a cane, knee braces,

and wrist splints. Outlaw also testified that his bipolar medication stabilized his mood, although it impaired his memory and ability to concentrate.

A vocational expert testified that Outlaw could not perform his past jobs, which required heavy semi-skilled labor, but that he could do other jobs involving light work. In response to a hypothetical question assuming that Outlaw could lift 20 pounds occasionally and either stand or sit for 6 hours, the expert testified that Outlaw could perform approximately 25,100 jobs, including working as a laundry worker or office clerk.

The ALJ denied Outlaw's claim for benefits after applying the 5-step evaluation process prescribed by 20 C.F.R. § 404.1520. He concluded that (1) Outlaw had not engaged in gainful employment since his alleged onset date; (2) his osteoarthritis, personality disorder, and drug dependency constituted severe impairments; (3) these impairments did not collectively equal a listed impairment; (4) Outlaw had the residual functional capacity ("RFC") to perform "light unskilled work" without public contact and with three steps, including jobs that require occasionally lifting 20 pounds, and standing, walking, or sitting for six hours in an eight-hour day; and (5) suitable jobs were available, including positions as a laundry or office worker.

At step 4 the ALJ determined that Outlaw was "not entirely credible" in light of discrepancies between his testimony, the severity of his asserted impairments, and the objective medical evidence. In explaining this ruling, the ALJ identified Outlaw's "major problem" as drug abuse. The ALJ also pointed out inconsistencies in Outlaw's stated chronology of events. Outlaw testified, for instance, that some of his daily activities had been limited for three years, yet his application alleged an onset disability date four-and-a-half years earlier. The ALJ also noted Outlaw's testimony about being injured in a car accident in 2003, even though the record reflected his complaints of pain beginning as early as 1999. Other factors that led the ALJ to discredit Outlaw's complaints of pain were Dr. Stronska's examination, the lack of evidence of significant pathology in Outlaw's back and knees, Outlaw's concession that medication stabilized his bipolar disorder, and a negative straight-leg-raise test suggesting that Outlaw no longer needed a cane or walker.

## II. Discussion

On appeal Outlaw challenges the ALJ's RFC finding, contending that the ALJ failed to properly evaluate his psychological disorders; his limited ability to stand, walk, or use his hands; and his obesity. He also attacks the ALJ's credibility determination, contending that the ALJ failed to consider the entire record.

We review the ALJ's ruling as the final word from the Commissioner of Social Security because the Appeals Council declined review, *see Moss v. Astrue*, 555 F.3d 556, 560 (7th Cir. 2009), and evaluate whether substantial evidence supports the ALJ's decision without paying deference to the district court. *See* 42 U.S.C. § 405(g); *Moss*, 555 F.3d at 560. Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal quotation marks and citation omitted). It "must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007).

An RFC assessment determines the most work a person could perform regularly. *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. This requires an ALJ to consider all functional limitations and restrictions that stem from medically determinable impairments, including those that are not severe. *See* SSR 96-8p. An ALJ need not discuss every piece of evidence, but must logically connect the evidence to the ALJ's conclusions so that we can provide meaningful review. *See Jones v. Astrue*, 623 F.3d 1155, 1160 (7th Cir. 2010). RFC determinations are inherently intertwined with matters of credibility, and we generally defer to an ALJ's credibility finding unless it is "patently wrong." *See id.*; *Castile v. Astrue*, 617 F.3d 923, 929 (7th Cir. 2010).

*A. The ALJ's Residual Functional Capacity Determination*

Outlaw first contends that the ALJ did not account for all of his mental impairments when determining his RFC. He primarily argues that the ALJ overemphasized his personality disorder and gave too little weight to diagnoses of bipolar disorder and depression.

We disagree. The ALJ adequately accounted for Outlaw's mental impairments when setting his RFC. The ALJ concluded that Outlaw's mental impairments limited him to "unskilled work" involving at most three tasks and no public contact. These restrictions tracked the conclusions of the agency psychologist, who diagnosed only personality and substance-abuse disorder and identified the same mental limitations. The ALJ repeated these findings nearly verbatim, without citing to the agency psychologist explicitly. In addition, the ALJ's three-task job limitation conforms to Outlaw's concession at the hearing that medication controlled his bipolar symptoms but impaired his memory.

Relatedly, Outlaw also argues that the ALJ did not properly discuss whether his drug and alcohol use could have resulted from his bipolar disorder. He contends that the ALJ, without specific citation to the record, characterized his drug use as his "major problem" and highlights the ALJ's disregard of a psychological examination in 2006 suggesting that substance abuse may have stemmed from his psychological impairments.

The ALJ's focus on Outlaw's drug use is significant because the ALJ relied on it to minimize the severity of Outlaw's asserted mental limitations.

Again, the ALJ's discussion is sufficient. We have previously recognized that bipolar disorder can *potentially* cause drug abuse, *see Kangail v. Barnhart*, 454 F.3d 627, 629 (7th Cir. 2006), but the ALJ's failure to expressly mention this potential link does not undermine his opinion. The ALJ found that drug abuse was Outlaw's "major problem," a conclusion substantially supported by the record. For instance, the ALJ cited medical records from 2007 that discuss Outlaw's long struggle with drug dependency, as well as evidence that Outlaw continued to use cocaine until only months before his hearing. Similar records appear throughout the period relevant to his application for benefits. Moreover, the ALJ did not need to dwell on the effect of Outlaw's bipolar disorder given his concession that medication controlled his bipolar symptoms and a psychiatrist's 2007 diagnosis that ruled out the disorder.

Outlaw argues next that the ALJ failed to explain how his limitations in his ability to stand, walk, and use his hands are consistent with the evidence. *See* SSR 96-8p. He contends that the ALJ did not discuss, let alone substantiate, how the pain caused by his foot and back condition would allow him to walk or stand for at least six hours a day, or how a limitation related to his hands was warranted.

The ALJ's conclusions regarding Outlaw's ability to stand, walk, and use his hands are supported by substantial evidence. The ALJ needed only to include limitations in his RFC determination that were supported by the medical evidence and that the ALJ found to be credible. *See Simila v. Astrue*, 573 F.3d 503, 520-21 (7th Cir. 2009); SSR 96-8p. Outlaw produced no medical evidence that he could not walk or stand for six hours over an eight-hour period, and he produced only negligible medical evidence that he suffered vocationally limiting impairments in his hands. The record contains little medical evidence of back pathology, as reflected by the ALJ's citation to a 2004 MRI showing only mild spinal disease. And the ALJ also referenced Dr. Stronska's report, where she recorded Outlaw's full range of movement without pain in his knees, and his ability to stand, bend, squat, and walk 50 feet unassisted and without difficulty.

Finally, Outlaw faults the ALJ for not expressly considering the impact of his obesity when determining his RFC. *See* SSR 02-1p. Social Security Ruling 02-1p requires adjudicators to specifically consider obesity when making an RFC determination because obesity can increase the claimant's limitations. Here, the ALJ considered Outlaw's obesity, albeit implicitly, when he referenced medical reports that acknowledged the relationship between Outlaw's weight and his pain. *See Prochaska v. Barnhart*, 454 F.3d 731, 736-37 (7th Cir. 2006);

*Skarbek v. Barnhart*, 390 F.3d 500, 504 (7th Cir. 2004). And any failure on the ALJ's part to more expressly address Outlaw's obesity was harmless error. *See Skarbek*, 390 F.3d at 504.

*B. The ALJ's Credibility Determination*

Outlaw also challenges the ALJ's credibility findings. He argues that the ALJ failed to comply with Social Security Ruling 96-7p by not considering all of his pain medications and the limited scope of his daily activities. *See* 20 C.F.R. §§ 404.1529(c), 416.929(c); SSR 96-7p.

Outlaw has not demonstrated that the ALJ's credibility determination was patently wrong. *See Castile*, 617 F.3d at 929. He claimed to have severe impairments that prevented him from undertaking most daily activities, but the medical evidence did not support his contentions. For example, the record contains little evidence of significant pathology in Outlaw's back and knees, and Dr. Stronska found that Outlaw could walk and manipulate objects with his hands without difficulty. The ALJ acknowledged that Outlaw took a variety of pain medications, outlined Outlaw's subjective complaints and objective diagnoses, and supported his conclusion using a variety of evidence. The depth or scope of the ALJ's analysis may not be ideal, but it satisfied the regulations and sufficiently connected the evidence to his conclusions.

AFFIRMED.