Carmen ACOSTA, Plaintiff,

v.

**Michael ASTRUE, Commissioner of the Social Security Administration, Defendant.**

**No. EP–10–CV–00471–DCG.**

United States District Court, W.D. Texas, El Paso Division.

March 2, 2012.

Cheryl L. Langston, The Law Office of Cheryl Langston, Forney, TX, for Plaintiff.

Angeline Sue Johnson–Reese, Dallas, TX, for Defendant.

## MEMORANDUM OPINION AND ORDER

DAVID C. GUADERRAMA, United States Magistrate Judge.

This is a civil action seeking judicial review of an administrative decision. Plaintiff, Carmen Acosta ("Acosta"), appeals from the decision of the Commissioner of the Social Security Administration ("Commissioner") denying her claim for disability insurance benefits under Title II of the Social Security Act. Pursuant to 42 U.S.C. § 405(g), the District Court has jurisdiction to hear the appeal. Upon consent of the parties, the District Court, in accordance with 28 U.S.C. § 636(c) and Appendix C of the Local Court Rules for this district, transferred the case to this Court for further proceedings and entry of judgment. After careful consideration of the parties' briefs, the Administrative Law Judge's ("ALJ") written decision, and the record evidence, the Court, for the reasons set forth below, finds that the final decision of the Commissioner should be **AFFIRMED.**

## I. BACKGROUND

Acosta, who was born in Mexico in 1960, was forty-nine years old at the time of the ALJ's decision. R. 32, 96, 218.[1] She is fluent in Spanish, but cannot speak, understand, read, or write in English. R. 122–23. She earned a sixth-grade education in Mexico. R. 32. In 2005, she obtained her general equivalency diploma (GED). R. 129. Her job experience includes working as a meat packer, technician, and machine operator. For nine years, she worked full-time as a machine operator at a manufacturing facility (Thermotech, Inc.). R. 32, 131. At that job, in an eight-hour work day, she walked for two hours and stood for two hours, and frequently lifted fifty pounds or more. R. 135. The facility was later closed and she was laid off in or about 2004. R. 32, 131. Since then, she has held various temporary jobs. R. 33, 131. Most recently, since March 2009, she is employed as a sewing machine operator at a garment manufacturing company that hires people with disabilities; she landed that job with assistance from the Texas

---

**1.** References to the transcript of the record of administrative proceedings [ECF No. 21] filed in this case are designated by "R." followed by page numbers.

Department of Assistive and Rehabilitation Services. R. 34–35, 177.

On March 14, 2008, Acosta filed an application for disability insurance benefits due to depression, hearing loss, high blood pressure (hypertension), and migraine, claiming a disability onset date of January 3, 2008. R. 123, 151. The state agency responsible for making initial disability determinations denied her application initially on June 12, 2008, and later upon reconsideration on August 18, 2008. Acosta requested a review of the denial by an ALJ. The ALJ held a *de novo* hearing on October 20, 2009. Represented by her attorney, Acosta appeared and testified at the hearing. She testified with the assistance of a Spanish interpreter. R. 31. The ALJ rendered a decision unfavorable to her, finding that from January 3, 2008, through November 19, 2009, the date of the ALJ's decision, she was not disabled within the meaning of the Social Security Act and was not entitled to the requested benefits. R. 24. On September 22, 2010, the Social Security Appeals Council denied her request for review of the ALJ's decision. R. 4.

Subsequently, Acosta filed a complaint with the District Court, seeking judicial review of the administrative decision pursuant to 42 U.S.C. § 405(g), along with a motion to proceed *in forma pauperis.* The motion was granted by this Court. Upon filing of an answer by the Commissioner, Acosta, on May 16, 2011, filed a brief in support of her request that the Court reverse the Commissioner's decision and remand the case for an award of benefits or, in the alternative, additional administrative proceedings. Pl.'s Br. in Support of Claim 11 [hereinafter Pl.'s Br.], ECF No. 24. On June 15, the Commissioner responded with a brief in support of its decision to deny benefits. Br. in Support of Comm'r's Decision 10 [hereinafter Comm'r's Br.], ECF No. 25.

## II. APPLICABLE LEGAL STANDARDS

### A. Standard of Review

■ Where, as here, the Appeals Council has declined to review the ALJ's decision, the ALJ's decision constitutes the final decision of the Commissioner. *Higginbotham v. Barnhart,* 405 F.3d 332, 336 (5th Cir.2005). Judicial review of the Commissioner's decision to deny benefits is limited to two inquires: (1) whether the Commissioner used the proper legal standards to evaluate the evidence and (2) whether the decision is supported by substantial evidence. *Masterson v. Barnhart,* 309 F.3d 267, 272 (5th Cir.2002); 42 U.S.C. § 405(g). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Greenspan v. Shalala,* 38 F.3d 232, 236 (5th Cir.1994) (quoting *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). "'It is more than a mere scintilla and less than a preponderance.'" *Boyd v. Apfel,* 239 F.3d 698, 704 (5th Cir.2001) (quoting *Harris v. Apfel,* 209 F.3d 413, 417 (5th Cir.2000)). "If the Commissioner's findings are supported by substantial evidence, then the findings are conclusive and the Commissioner's decision must be affirmed." *Martinez v. Chater,* 64 F.3d 172, 173 (5th Cir. 1995) *(per curiam )* (citations omitted). If, on the other hand, the Commissioner's findings are not supported by substantial evidence, or the Commissioner incorrectly applied the law, the reviewing court may, *inter alia,* reverse the Commissioner's decision and remand the case for further proceedings. *Murkeldove v. Astrue,* 635 F.3d 784, 792 (5th Cir.2011) (discussing a remand pursuant to sentence four of 42 U.S.C. § 405(g)).

In determining whether substantial evidence of disability is present, the court "weighs four factors: (1) objective medical evidence; (2) diagnoses and opinions; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history." *Perez v. Barnhart*, 415 F.3d 457, 462 (5th Cir.2005) (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir.1991)). The court must scrutinize the entire record to determine whether such evidence is present, but it may not reweigh the evidence, try the issues *de novo*, or substitute its judgment for that of the Commissioner, even if the evidence weighs against the Commissioner's decision. *Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir.2001) (*per curiam*); *Newton v. Apfel*, 209 F.3d 448, 452 (5th Cir.2000). A finding of no substantial evidence, however, is appropriate only "where there is a conspicuous absence of credible choices or no contrary medical evidence." *Johnson v. Bowen*, 864 F.2d 340, 343–44 (5th Cir.1988) (*per curiam*) (internal quotation marks and citation omitted).

## B. The Standard for Entitlement to Social Security Benefits and Burden of Proof

An individual applying for benefits bears the initial burden of proving that he or she suffers from a disability, which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Perez*, 415 F.3d at 461 (citations omitted). "Substantial gainful activity is defined as work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452–53 (citing 20 C.F.R. § 404.1572(a)-(b)).

In evaluating a disability claim, the Commissioner is required to conduct a five-step sequential analysis to determine "(1) whether the claimant is currently engaged in substantial gainful activity (whether the claimant is working); (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals the severity of an impairment listed in 20 C.F.R., Part 404, Subpart P, Appendix 1; (4) whether the impairment prevents the claimant from doing past relevant work (whether the claimant can return to his [or her] old job); and (5) whether the impairment prevents the claimant from doing any other work." *Perez*, 415 F.3d at 461 (citations omitted). The claimant bears the burden of showing that she is disabled through the first four steps of the analysis; on the fifth, the Commissioner must show that there is other substantial work in the national economy that the claimant can perform. *Audler v. Astrue*, 501 F.3d 446, 448 (5th Cir.2007). " 'Once the Commissioner makes this showing, the burden shifts back to the claimant to rebut this finding.' " *Perez*, 415 F.3d at 461 (quoting *Newton*, 209 F.3d at 453).

If, at any step, the Commissioner can determine that the claimant is disabled or not disabled, that ends the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir.1987). If, however, the Commissioner cannot make such a finding, the analysis proceeds to the next step. *Perez*, 415 F.3d at 461. Before considering the fourth and fifth steps, the Commissioner must assess the claimant's residual functional capacity ("RFC"), which is, in layman's terms, her maximum work capability. *Id.* at 461–62; 20 C.F.R. §§ 404.1520(e), 404.1545(a). "The claimant's RFC is used at both steps four and five of the sequential analysis: at the fourth step to determine if the claimant can still do his [or her] past relevant

work, and at the fifth step to determine whether the claimant can adjust to any other type of work." *Perez*, 415 F.3d at 462 (citing § 404.1520(e)).

## III. THE ALJ'S FINDINGS AND CONCLUSIONS OF LAW AND PLAINTIFF'S CLAIMS ON APPEAL

The ALJ found, as a threshold matter, that Acosta's last date insured was December 31, 2011. R. 20. At Step One of the five-step sequential process, the ALJ found that Acosta had not engaged in substantial gainful activity since January 3, 2008, the alleged disability onset date. *Id.* At Step Two, he determined that Acosta had severe impairments of hearing loss, hypertension, and migraine headaches. *Id.* However, he found that Acosta's mental impairment of depressive disorder was not severe. R. 21. He then went on to find that Acosta did not have an impairment or combination of impairments that met or equaled any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, for which she would be found presumptively disabled. R. 22. The ALJ next determined that Acosta had the RFC to perform a full range of "medium work."[2] *Id.* He then concluded that consistent with her RFC, she was capable of performing her past relevant work as a machine operator. R. 23. Accordingly, the ALJ ruled that Acosta was not disabled, as defined by the Social Security Act, during the period from January 3, 2008, through November 19, 2009 (the date on which the ALJ issued his decision); further analysis of Acosta's disability claim ceased. *Id.*

On appeal here, Acosta challenges the ALJ's ruling on two principal grounds— each with two specific claims. By her first ground, she complains that the ALJ erred in finding that her mental impairment was not severe. Specifically, she claims that the ALJ committed a legal error by applying an improper severity standard. Pl.'s Br. 4. She further claims that substantial evidence does not support the ALJ's finding that her mental impairment was not severe. *Id.* By her second ground, she asserts that the ALJ's RFC finding that she was capable of performing a full range of medium work was erroneous. In particular, she claims that the ALJ erred by failing to include in his RFC finding all limitations supported by evidence. *Id.* at 11. Finally, she claims that in assessing her RFC, the ALJ committed a legal error by not making a specific finding regarding her ability to sustain employment. *Id.* at 10.

The Court will address each of Acosta's claims in turn.

## IV. DISCUSSION

### A. The ALJ's Finding That Plaintiff's Mental Impairment Was Not Severe

#### 1. *Plaintiff's Claim That the ALJ Committed a Legal Error by Applying an Improper Severity Standard*

■ Acosta claims that the ALJ used an improper severity standard to find that her mental impairment was not severe. Pl.'s Br. *3–4*. Under the regulations, an impairment is not severe "if it does not significantly limit your physical or mental ability to do basic work activities." 20 C.F.R. § 404.1521(a); *see also* 20 C.F.R. § 404.1520(c).[3] These regulations define

---

**2.** The regulations define "medium work" as work involving "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds. If someone can do medium work, we determine

that he or she can also do sedentary and light work." 20 C.F.R. § 404.1567(c).

**3.** "If you do not have any impairment or combination of impairments which signifi-

the threshold of impairment severity as "significantly limit" or a significant limitation on ability to work. The Fifth Circuit has construed these regulations as setting forth the following standard of non-severity: "an impairment can be considered as not severe only if it is a slight abnormality having such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work, irrespective of age, education or work experience." *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir.1985) (internal brackets omitted) (quoting *Estran v. Heckler*, 745 F.2d 340, 341 (5th Cir.1984) (*per curiam*), and citing *Martin v. Heckler*, 748 F.2d 1027, 1032 (5th Cir.1984), and *Davis v. Heckler*, 748 F.2d 293, 296 (5th Cir.1984) (*per curiam*)). For ease of discussion, hereinafter, we will refer to the Fifth Circuit's standard as the "slight abnormality"[4] standard. Unless this standard is used, "the claim must be remanded to the [Commissioner] for reconsideration." *Stone*, 752 F.2d at 1106. Further, under *Stone's* presumption for a remand, a reviewing court must assume that the ALJ "applied an incorrect standard to the severity requirement unless the correct standard is set forth by reference to [the *Stone*] opinion or another of the same effect, or by an express statement that the construction [the Fifth Circuit] give[s] to 20 C.F.R. § 404.1520(c) (1984) is used." *Stone*, 752 F.2d at 1106.

Here, in his written decision, the ALJ did not cite to *Stone* or another court opinion of the same effect, recite *ipsissimis verbis* the construction the Fifth Circuit gives to § 404.1520(c), or expressly state that he used that construction. Instead, under the "Applicable Law" section of his opinion, the ALJ stated:

> An impairment or combination of impairments is "severe" within the meaning of the regulations if it significantly limits an individual's ability to perform basic work activities. An impairment or combination of impairments is "not severe" when medical and other evidence establish only *a slight abnormality or a combination of slight abnormalities that would have no more than a minimal effect on an individual's ability to work.*

R. 19 (emphasis added) (citing 20 C.F.R. § 404.1521(a); Social Security Regulation ("SSR") 85–28, 1985 WL 56856, at *3 (S.S.A.1985); and SSR 96–3p, 1996 WL 374181, at *1 (S.S.A.1996)). The above-quoted text appears, with some minor linguistic variations, in SSR 96–3p. Only the last sentence of the above-quoted text appears in SSR 85–28, again with some minor semantic variations. (These regulations will be discussed fully *infra.*) Moreover, in his analysis, the ALJ applied 20 C.F.R. § 404.1520a(d)(1) to conclude that Acosta's mental impairment was not severe. R. 21–22. That regulation describes a step in the Social Security Administration's ("Administration" or "SSA") "special technique," called the psychiatric review technique ("PRT"), that ALJs are bound to follow in determining a mental impairment's severi-

---

cantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled." 20 C.F.R. § 404.1520(c). "Basic work activities" include "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling; [c]apacities for seeing, hearing, and speaking; [u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]e-

sponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting." 20 C.F.R. § 404.1521(b) (internal numbering omitted).

4. *See Hampton v. Bowen*, 785 F.2d 1308, 1311 (5th Cir.1986) (referring to the Fifth Circuit's standard as the slight abnormality standard).

ty at the second and third steps of the sequential process.[5] Significantly, § 404.1520a(d)(1), like SSR 96–3p and SSR 85–28, defines the threshold of impairment non-severity as *no more than minimal effect or limitation on ability to work.*[6] From here, this standard will be referenced as the "minimal effect" standard.

In support of her claim, Acosta points out that in concluding that her depressive disorder was not severe, the ALJ found that her impairment "does not cause *more than* minimal limitation in the claimant's ability to perform basic [mental] work activities"—a finding the ALJ made pursuant to § 404.1520a(d)(1). Pl.'s Br. at 3 (emphasis in original) (quoting R. 21). Thus, under the standard used by the ALJ, she appears to assert, an impairment can cause some—albeit not more than min-

imal—limitation in a claimant's ability to work and yet be considered not severe. *Id.* 3–4. Consequently, the ALJ's standard, goes her argument, is contrary to the Fifth Circuit's slight abnormality standard, which, she insists, "'provides for *no allowance for a minimal interference* on a claimant's ability to work.'" *Id.* at 4 (emphasis added) (quoting *Scroggins v. Astrue*, 598 F.Supp.2d 800, 805 (N.D.Tex. 2009)). Her argument thus raises the issue whether the minimal effect standard— i.e., the standard espoused in SSR 85–28, SSR 96–3p, and 20 C.F.R. § 404.1520a(d)(1), and used by the ALJ here—is inconsistent with the Fifth Circuit's slight abnormality standard.[7] The Court will address this issue as a threshold matter.

---

5. *See Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 723 (9th Cir.2011) ("[A]n ALJ is bound by 20 C.F.R. § 404.1520a."); *Kohler v. Astrue*, 546 F.3d 260, 265 (2d Cir.2008) (20 C.F.R. § 404.1520a "require[s] application of a 'special technique' at the second and third steps of the five-step framework." (citations omitted)). *See also Randall v. Astrue*, 570 F.3d 651, 658 (5th Cir.2009) (*per curiam*) (describing the special technique in the context of a Step Three analysis).

6. In applying the agency's special technique, an ALJ first rates a claimant's limitations in four broad functional areas. The first three functional areas, i.e., activities of daily living, social functioning, and concentration, persistence, or pace, are rated on a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The final functional area, i.e., episodes of decompensation, is rated on a four-point scale of none, one or two, three, and four or more. *Id.* Next, the ALJ follows § 404.1520a(d)(1), which provides: "If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will *generally* conclude that your impairment(s) is not severe, *unless* the evidence otherwise indicates that there is more than a minimal limitation in your ability to do ·basic work activities." 20 C.F.R.

§ 404.1520a(d)(1) (emphasis added). The § 404.1520a(d)(1) analysis is bifurcated under a general rule and an exception to that general rule. Under the general rule, an impairment is not severe if the requisite conditions are met: that is, the impairment causes no more than "mild" limitations in the areas of activities of daily living, social functioning, and concentration, persistence, or pace, and "no" episodes of decompensation. However, the exception to the general rule (the "unless clause") requires the ALJ to make a broader inquiry: whether the impairment results in "more than a minimal limitation in your ability to do basic work activities"; if it does, a finding that the impairment is not severe is not proper. Consequently, the all-encompassing exception, which in essence swallows the general rule, sets forth the non-severity threshold as "more than a minimal limitation" in ability to work.

7. The Court notes that in its brief, the Commissioner does not directly address this precise issue. The Commissioner, however, asserts that *Stone* is not at issue because the ALJ did not conclude at Step Two that Acosta was not disabled, but instead found her not disabled at Step Four. Comm'r's Br. 3–4. Alternatively, the Commissioner argues that the ALJ's analysis of Acosta's depression complied with *Stone*. *Id.* at 4.

The Fifth Circuit has not had the occasion to address this precise issue. It is, therefore, instructive to examine our appellate court's case law adopting and applying its slight abnormality standard and review the Administration's responses to the Fifth Circuit's adoption of that standard. Accordingly, the Court begins by a review of the historical backdrop against which the Fifth Circuit's slight abnormality standard and the Administration's minimal effect standard emerged, focusing upon the regulatory and policy changes announced by the Administration during the period relevant here.

Shortly after Congress enacted the Social Security Amendments Act of 1954, which defined "disability" in substantially the same language as appears in today's 42 U.S.C. § 423(d)(1)(A),[8] the Administration promulgated the first of its severity regulations. That regulation defined impairment severity "in a negative sense," i.e., when an impairment is deemed not severe, 43 Fed.Reg. 55358 (Nov. 28, 1978), and read, in relevant part: "medical considerations alone may justify a finding that the individual is not under a disability where the only impairment is *a slight neurosis, slight impairment of sight or hearing, or similar abnormality or combination of slight abnormalities.*" 25 Fed.Reg. 8100 (Aug. 24, 1960) (to be codified at 20 C.F.R. § 404.1502(a) (1961)). In 1967, Congress once again amended the definition of disability by adding what is now 42 U.S.C. § 423(d)(2)(A).[9] To implement the new definition, the Administration amended its regulations in 1968, but left undisturbed its prior definition of non-severe impairment. 33 Fed.Reg. 11750 (Aug. 20, 1968); 20 C.F.R. § 404.1502(a) (1969). In 1978, when the Administration issued new regulations promulgating the sequential evaluation process for disability determination, a new terminology, "significantly limit," was introduced to describe the threshold of impairment severity: "[a] medically determinable impairment is not severe if it does not *significantly limit* an individual's physical or mental capacity to perform basic work-related functions." 43 Fed.Reg. 55363 (Nov. 28, 1978) (to be codified at 20 C.F.R. § 404.1504(a) (1979)) (emphasis added); *see also id.* ("Where an individual does not have any impairment(s) which significantly limits his or her physical or mental capacity to perform basic work-related functions, a finding shall be made that he or she does not have a severe impairment and therefore is not under a disability without consideration of the vocational factors.") (to be codified at 20 C.F.R. § 404.1503(c) (1979)). These "significant limitations" regulations were later renumbered and amended with minor variations in language in 1980,[10] when the Ad-

---

**8.** The 1954 amendment defined "disability" as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of long-continued and indefinite duration...." Social Security Amendments of 1954, Pub.L. No. 83–761, 68 Stat. 1080 (Sept. 1, 1954).

**9.** That amendment provided: "an individual ... shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but

cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." Social Security Amendments of 1967, Pub.L. No. 90–248, 81 Stat. 868 (Jan. 2, 1968). The statutory definition of disability has since remained unchanged.

**10.** Thus, the 1980 successor of 20 C.F.R. § 404.1504(a) (1979) read, "[a]n impairment is not severe if it does not significantly limit your physical or mental abilities to do basic work activities," 45 Fed.Reg. 55588 (Aug. 20, 1980) (to be codified at 20 C.F.R.

ministration rewrote the disability regulations "to make them easier to read and understand." 45 Fed.Reg. 55566 (Aug. 20, 1980).

The significant limitation regulations of 1978 were promulgated to achieve greater program efficiency "by limiting the number of cases in which it would be necessary to follow the vocational evaluation sequence" in full. 45 Fed.Reg. 55574 (Aug. 20, 1980). In a 1978 notice of proposed rules, the Administration explained, "[t]here are ... various levels of impairment severity." 43 Fed.Reg. 9296 (Mar. 7, 1978). At the upper end of the impairment severity are those impairments that meet the duration requirements and are listed in the appendix to the regulations (or are medically the equivalent thereof) for which medical considerations alone can justify a finding of disabled. *Id.* "Conversely, there is a point in the range of impairment severity below which the effects of the impairment(s) have such a minimal effect on the individual that they would not be expected to interfere with his or her ability to work, irrespective of his or her age, education, and work experience." *Id.* By identifying at an early stage of the sequential evaluation process those claimants whose medical impairments are of severity at these two extremes, the Administration sought to streamline its decisional process.

The Administration, however, made it abundantly clear that the new terminology in the significant limitation regulations was intended solely to clarify, not change, the prior definition of impairment severity as embodied in the 1968 regulations. 43 Fed. Reg. 55357–58 (Nov. 28, 1978); *see also id.*

at 55358 ("[T]here is no intention to alter the levels of severity for a finding of disabled or not disabled on the basis of medical considerations alone."). Yet, it soon became evident that through literal application of the regulations, the agency decisionmakers were systematically denying benefits to claimants who would otherwise satisfy the statutory criteria for disability. *See Estran,* 745 F.2d at 341; *Martin,* 748 F.2d at 1034 n. 2; *Stone,* 752 F.2d at 1103; *Chico v. Schweiker,* 710 F.2d 947, 954, 955 & n. 10 (2d Cir.1983); *see also Bowen v. Yuckert,* 482 U.S. 137, 157, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987) (O'Connor, J., concurring) (noting that empirical "evidence suggests that step two [of the sequential evaluation process] has been applied systematically in a manner inconsistent with the statute"). Consequently, the courts, including the Fifth Circuit, were confronted with a series of cases in which a decisive administrative determination was made against disability at step two on the grounds of non-severity. *See Yuckert,* 482 U.S. at 156–57, 107 S.Ct. 2287 (O'Connor, J., concurring) ("The frustration expressed by these courts in dealing with the [Commissioner's] application of step two in particular cases is substantial, and no doubt in part accounts for the Court of Appeals' decision in this case to simply enjoin the regulation's further use.").

Against this backdrop, the Fifth Circuit decided the quartet of cases—*Estran, Davis, Martin,* and *Stone*—and adopted the slight abnormality standard. In *Estran,* at issue was whether the ALJ properly applied 20 C.F.R. § 416.921(a) (1982) (the Supplemental Security Income Act's

§ 404.1521(a) (1981)), and the 1980 successor of 20 C.F.R. § 404.1503(c) (1979) read, "[i]f you do not have any impairment(s) which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and

are, therefore, not disabled. We will not consider your age, education, and work experience." 45 Fed.Reg. 55588 (Aug. 20, 1980) (to be codified at 20 C.F.R. § 404.1520(c) (1981)). Since then, these regulations have remained largely intact to this day.

counterpart to 20 C.F.R. § 404.1521(a) (1982), containing the same "significantly limit" language) to deny benefits to the plaintiff at Step Two. The Court of Appeals held that the regulation must be read in light of the 1968 regulations—a view it shared with the Eleventh Circuit in *Brady v. Heckler*, 724 F.2d 914 (11th Cir.1984) (*per curiam* ). *Estran*, 745 F.2d at 340–41. Accordingly, our appellate court adopted *Brady's* construction of the significant limitation regulations as its standard of impairment non-severity. *See Martin*, 748 F.2d at 1032 (stating *Estran* adopted *Brady's* construction). It should be noted that *Brady* in turn had adopted as its construction the Appeals Council's non-severity definition, which the Council viewed as equally applicable under the 1968's "slight neurosis" regulations and the 1978's significant limitation regulations. *Brady*, 724 F.2d at 919–20 (quoting *Appeals Council Review of Sequential Evaluation Under Expanded Vocational Regulations* (1980)). Subsequently, in *Davis, Martin,* and *Stone,* the Fifth Circuit reaffirmed the construction it adopted in *Estran* and applied that standard of non-severity to remand cases where the agency's determinations of non-severity at Step Two were premised on a literal application of the other provisions of the significant limitation regulations, to wit, 20 C.F.R. §§ 404.1520(c), 404.1521(a), 416.920(c). Moreover, to censure further misuse of the severity regulations, the *Stone* court issued its directive to remand a case where agency decisionmakers fail to set forth the Fifth Circuit's non-severity standard by, among other alternatives, reference to its opinion or another of the same effect. *Stone*, 752 F.2d at 1106.

Taking a nudge from the *Estran–Davis–Martin–Stone* cases, the Administration responded by issuing multiple rulings. Shortly after *Stone* was decided, it issued SSR 85–28 (the ALJ cited this ruling in support of the standard he used here), amending its policy for determining non-severity. That ruling provides, in relevant part:

> An impairment or combination of impairments is found "not severe" and a finding of "not disabled" is made at [the second] step when medical evidence establishes only a slight abnormality or a combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work even if the individual's age, education, or work experience were specifically considered (i.e., the person's impairment(s) has no more than a minimal effect on his or her physical or mental ability(ies) to perform basic work activities).

SSR 85–28, 1985 WL 56856, at *3 (S.S.A. 1985). The Administration explained, "[this ruling] is being issued to clarify that SSA's policy is consistent with various court decisions," including *Estran* and *Stone* (these cases were expressly referenced in the ruling). *Id.* at *2. The Administration also rescinded a prior ruling, SSR 82–55, which, like SSR 85–28, was entitled "Title II and XVI: Medical Impairments That Are Not Severe," but unlike SSR 82–55, had expressed the threshold of impairment severity in language that closely tracked the text of the significant limitation regulations: "For an impairment to be considered severe, it must significantly limit the individual's physical or mental capacity to perform one or more basic work-related functions.... An impairment that does not significantly limit the capacity to perform work-related functions, as they are required in most jobs, is not severe." SSR 82–55, 1982 WL 31375, at *2 (S.S.A.1982); *see also Reyes v. Sullivan*, 915 F.2d 151, 154 n. 1 (5th Cir.1990) (*per curiam* ) (stating SSR 82–55 was rescinded after *Stone* was decided). More

recently, the Administration issued yet another ruling, SSR 96–3p, which provides, in pertinent part:

> At step 2 of the sequential evaluation process, an impairment or combination of impairments is considered "severe" if it significantly limits an individual's physical or mental abilities to do basic work activities; an impairment(s) that is "not severe" must be a slight abnormality (or a combination of slight abnormalities) that has no more than a minimal effect on the ability to do basic work activities.

SSR 96–3p, 1996 WL 374181, at *1 (S.S.A. 1996) (citing SSR 85–28). As noted *supra*, the ALJ also cited to this ruling in support of the standard he used.

To date, however, the Administration has not amended the "significantly limit" language of the regulations whose constructions were at issue in *Estran, Davis, Martin*, and *Stone*. Nevertheless, in 2000 the Administration amended one of its PRT regulations that had defined the severity threshold for mental impairments in much the same language as do the significant limitation regulations. That regulation was 20 C.F.R. § 404.1520a(c)(1) (1986)—the predecessor of 20 C.F.R. § 404.1520a(d)(1) (2009), pursuant to which the ALJ analyzed the severity of Acosta's depressive disorder. Introduced shortly after *Stone* was decided, § 404.1520a(c)(1)

precluded a finding that a claimant's mental impairment is not severe where the impairment caused "*significant limitation* of [her] mental ability to do basic work activities."[11] 50 Fed.Reg. 35065 (Aug. 28, 1985) (emphasis added). When the Administration amended the PRT regulations (i.e., 20 C.F.R. § 404.1520a and 20 C.F.R. § 416.920a) in 2000, it, among other things, relettered § 404.1520a(c) to § 404.1520a(d), and substituted § 404.1520a(c)(1)'s "significant limitation" language with "more than a minimal limitation" language in § 404.1520a(d)(1).[12] A 1991 "Notice of Proposed Rulemaking" published by the Administration indicates that this change in language was made to conform the regulation to SSR 85–28, discussed *supra*. 56 Fed.Reg. 33131 (July 18, 1991) ("The language in ... proposed §§ 404.1520a(c)(1) and (2) and 416.920a(c)(1) and (2) [in the final rules, subsection (c) was relettered to subsection (d) ] reflects our longstanding policy as to what constitutes a severe impairment under §§ 404.1521 and 416.921 and *Social Security Ruling 85–28.*" (emphasis added)).

These post-*Stone* responses by the Administration evince its efforts to bring its policies on non-severity determination in line with the slight abnormality standard pronounced by the Fifth Circuit. Critically, they inform that the Administration

---

11. That regulation in full text read as follows: "If the four areas considered by us as essential to work have been rated to indicate a degree of limitation as "none" or "slight" in the first and second areas, "never" or "seldom" in the third area, and "never" in the fourth area, we can generally conclude that the impairment is not severe, unless the evidence otherwise indicates there is *significant limitation* of your mental ability to do basic work activities (see § 404.1521)." 50 Fed. Reg. 35065 (Aug. 28, 1985) (emphasis added) (to be codified at 20 C.F.R. § 404.1520a(c)(1) (1986)).

12. *Compare supra* note 11, *with* 65 Fed.Reg. 50775 (Aug. 21, 2000) ("If we rate the degree of your limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, we will generally conclude that your impairments) is not severe, unless the evidence otherwise indicates that there is *more than a minimal limitation* in your ability to do basic work activities (see § 404.1521)." (emphasis added) (to be codified at 20 C.F.R. § 404.1520a(d)(1) (2001)).

views its non-severity standard—phrased in terms of "minimal effect"/"minimal limitation" on ability to work—as entirely consistent with the Fifth Circuit's non-severity standard. Of course, whether its "minimal effect"/"minimal limitation" standard is *in fact* consistent with the Fifth Circuit's non-severity standard is quite a different matter.

Presently, there is a split among our sister courts that have had the occasion to review this precise issue. Some courts have held, often without elaboration, that a standard using the "minimal effect" language as used in SSR 85–28 and SSR 96–3p is consistent with the Fifth Circuit's non-severity standard.[13] Other courts have held to the contrary.[14] A representative case from this later line of authority is *Scroggins v. Astrue*, 598 F.Supp.2d 800 (N.D.Tex.2009)—a case Acosta cites here in support of her contention that the ALJ applied an improper standard. There, in finding that the claimant-plaintiff's mental impairment was not severe, the ALJ did not explicitly reference *Stone* or a similar opinion applying the Fifth Circuit's standard. *Scroggins*, 598 F.Supp.2d at 805.

Instead, the ALJ cited the standard from 20 C.F.R. § 404.1520(c) and additionally stated: "[a]n impairment or combination of impairments is 'not severe' when medical or other evidence establish only a slight abnormality or combination of slight abnormalities *that would have no more than a minimal effect on an individual's ability to work.*"[15] *Id.* (emphasis in original). The court remarked that under the ALJ's standard, "a [non-]severe impairment could have, at most, a minimal effect on a claimant's ability to work," but under the *Stone* standard, "a [non-]severe impairment 'would *not* be expected to interfere with the individual's ability to work.'" *Id.* (alterations added)[16] (emphasis in original) (quoting *Stone*, 752 F.2d at 1101). The court construed this language in the *Stone* standard to mean that "*Stone* provides no allowance for a minimal interference on a claimant's ability to work." *Id.* The court concluded that the ALJ's standard was not consistent with the standard set forth in *Stone. Id.*

Another illustrative case from this later line of authority is *Padalecki v. Astrue*, 688 F.Supp.2d 576 (W.D.Tex.2010), where

13. *E.g., Vaughn v. Astrue*, No. 3:08–CV–1920–L, 2009 WL 3874607, at *5 (N.D.Tex. Nov. 17, 2009); *White v. Astrue*, No. 4:08–CV–415–Y, 2009 WL 763064, at *2, *9–*11 (N.D.Tex. Mar. 23, 2009); *Yantis v. U.S. Comm'r Soc. Sec. Admin.*, No. 08–CV–0548, 2009 WL 512189, at *1 (W.D.La. Feb. 27, 2009); *Stewart v. Astrue*, No. 07–CV–232–C, 2009 WL 187581, at *3 (M.D.La. Jan. 26, 2009); *Franzen v. Astrue*, 555 F.Supp.2d 720, 728, 735 (W.D.Tex.2008); *Winget v. Astrue*, No. MO–07–CV–017, 2007 WL 4975206, at *7 (N.D.Tex. Dec. 14, 2007); *Bustos v. Barnhart*, No. Civ. A. 5:04–CV–1132–FB (NN), 2005 WL 3353745, at *8 & n. 107 (W.D.Tex. Dec. 1, 2005); *Barfield v. Barnhart*, 285 F.Supp.2d 827, 834 (S.D.Tex.2002).

14. *E.g., Padalecki v. Astrue*, 688 F.Supp.2d 576, 580–81 (W.D.Tex.2010); *Luna v. Astrue*, No. 3:09–CV–1436–M–BH, 2010 WL 582151, at *6 (N.D.Tex. Feb. 18, 2010); *Johnson v.*

*Astrue*, No. H–08–3658, 2010 WL 148411, at *17 (S.D.Tex. Jan. 11, 2010); *Ruby v. Astrue*, No. 3:08–CV–1012–B (BF), 2009 WL 4858060, at *7–*8 (N.D.Tex. Dec. 14, 2009); *Scroggins v. Astrue*, 598 F.Supp.2d 800, 805–06 (N.D.Tex.2009); *Sanders v. Astrue*, No. 3:07–CV–1827–G (BH), 2008 WL 4211146, at *7 (N.D.Tex. Sept. 12, 2008).

15. This additional statement by the ALJ in *Scroggins* essentially tracks the language of SSR 85–28 and the standard set forth by the ALJ in the case at bar.

16. In the quoted language, the words in brackets, i.e., "[non-]," are added by this Court. The *Scroggins* court's analysis, read in context, indicates that the court intended to state "a non-severe impairment," as opposed to "a severe impairment," in the cited portion of its opinion.

the court shared the *Scroggins* court's view on this issue. There, the ALJ, much like the ALJ in *Scroggins* and the ALJ in the case at bar, set forth a non-severity standard that closely tracked the language of SSR 85–28. *Padalecki,* 688 F.Supp.2d at 580, 584. The court parsed the language of the Fifth Circuit's standard as follows. It noted that " '[s]light' quantifies the abnormality and 'minimal' quantifies the effect on the individual." *Id.* at 585. Although the court recognized that "to have meaning, 'minimal effect' could refer to the individual's ability to work," it remarked that our appellate court did not phrase the severity standard that way, and "[a]s it stands, *Stone* does not allow *any* interference with the individual's ability to work." *Id.* (emphasis added). Because the standard used by the ALJ "allows for a finding of non-severity if the abnormality has only a minimal effect on the individual's ability to work," the court concluded the ALJ's standard was inconsistent with the *Stone* standard. *Id.*

*Scroggins, Padalecki,* and other opinions [17] that likewise hold that the Fifth Circuit's non-severity standard provides no allowance for any—even minimal—interference or effect on a claimant's ability to work, rely on a strict and narrow reading of that standard. However, a closer reading of its non-severity jurisprudence reveals that our appellate court does not give such a narrow construction to its standard. In *Martin,* 748 F.2d 1027, *supra,* a progenitor of *Stone,* concluding that under the non-severity standard set forth in *Estran,* the ALJ's Step Two finding that Martin had a non-severe breathing impairment was erroneous, the Fifth Circuit held, "the [Commissioner] was in error in eliminating Martin at step 2, because the impairment was more than a slight abnormality with *minimal effect on his ability to work,* the test for elimination at step 2." *Martin,* 748 F.2d at 1031 (emphasis added). Again, more recently, in *Loza v. Apfel,* 219 F.3d 378 (5th Cir.2000), in reversing and remanding the case, in part because the ALJ did not apply the *Stone* standard in finding that Loza's mental impairment was non-severe, the Fifth Circuit instructed the Commissioner to determine on remand whether Loza's mental impairment was "not merely a slight abnormality *of minimal effect on ability to work.*" *Loza,* 219 F.3d at 399 (emphasis added). *Martin* and *Loza* thus provide the necessary guideposts on how to apply the Fifth Circuit's slight abnormality standard to determine severity of an impairment. They inform that under that standard, an impairment is not severe if it is merely, or no more than, a slight abnormality *with minimal effect* on ability to work.[18]

Moreover, in a number of unpublished opinions, our appellate court has approved

---

17. *See supra* note 14 (listing cases).

18. To the extent that the Fifth Circuit in *Estran* adopted as its non-severity standard *Brady's* construction of the significant regulations, it is worth noting how the *post-Brady* cases from the Eleventh Circuit interpreted the *Brady* standard. Shortly after *Brady* was decided, the Eleventh Circuit interpreted *Brady* to require an inquiry as to whether an impairment "is merely a slight abnormality with minimal effect on [the claimant's] general ability to work." *Flynn v. Heckler,* 768 F.2d 1273, 1274–75 (11th Cir.1985). "In other words, the issue is whether or not [the impairment] has only a minimal effect on [the claimant's] ability" to perform basic work activities. *Id.* at 1275. Severity is "measured in terms of its effect upon ability to work, and not simply in terms of deviation from purely medical standards of bodily perfection or normality." *McCruter v. Bowen,* 791 F.2d 1544, 1547 (11th Cir.1986). Later, to further clarify the *Brady* standard, the Eleventh Circuit explained that the claimant, whose burden at Step Two is "mild," "need show only that her impairment is not so slight and its effect is not so minimal." *McDaniel v. Bowen,* 800 F.2d 1026, 1031 (11th Cir.1986).

of administrative findings of a non-severe impairment, where those findings were premised on a determination that the impairment had no more than a minimal effect or limitation on the claimant's ability to work.[19] In other cases, the Fifth Circuit equated its slight abnormality standard with a standard defining non-severe impairment as having no more than a minimal effect on ability to work.[20] The most recent example of such a case is *Brunson v. Astrue*, 387 Fed.Appx. 459 (5th Cir.2010) (*per curiam*) (unpublished). There, in reviewing the ALJ's Step Two findings, the Fifth Circuit stated: "An impairment is severe if it significantly limits an individual's physical or mental abilities to do basic work activities; it is not severe if it is a slight abnormality or combination of slight abnormalities that has no more than a minimal effect on the claimant's ability to do basic work activities." *Brunson*, 387 Fed.Appx. at 461 (citing *Stone*, 752 F.2d at 1101). This language tracks SSR 96–3p's language describing severe and non-severe impairments; further, the second sentence recites SSR 85–28's delineation of what impairment is non-severe, which the ALJ referenced in that case. Critically, in setting forth the above-quoted description of severity, the *Brunson* panel cited only to *Stone*. The panel went on to conclude that "[t]he ALJ applied the proper legal stan-

dard of *Stone v. Heckler*" and that substantial evidence supported "the ALJ's conclusion that Mr. Branson's back pain did not impose more than a minimal effect on his ability to engage in basic work-related activities." *Id.* It is therefore crystalline that the *Brunson* court viewed the SSR standard and the *Stone* standard as one in the same.

Taken together, *Martin*, *Loza*, and these unpublished cases reveal that since the time it adopted the slight abnormality standard, our appellate court has all along viewed that standard as providing an allowance for a minimal effect on ability to work without also rendering the impairment severe. Accordingly, this Court declines Acosta's invitation to follow the *Scroggins* line of cases. Moreover, the Court cannot escape the conclusion that, despite minor semantic differences, the standard used by the ALJ, and—by extension the standard promulgated in SSR 85–28 and SSR 96–3p and codified in 20 C.F.R. § 404.1520a(d)(1) to the extent they define a non-severe impairment as having no more than a minimal effect or limitation on ability to work—are consistent with and conform to the slight abnormality standard adopted by the Fifth Circuit. The Court therefore holds that the ALJ used the proper legal standard in finding that Acos-

---

**19.** *See, e.g., Brooks v. Shalala*, 33 F.3d 1380, 1994 WL 487258, at *1 (5th Cir.1994) (*per curiam*) (unpublished) (noting approvingly that the ALJ concluded that the claimant's mental "impairment is a slight abnormality which has only a minimal effect upon the claimant's ability to work and as such does not constitute a severe impairment." (citing *Stone*, 752 F.2d at 1101)); *Landfried v. Apfel*, 218 F.3d 743, 2000 WL 821361, at *2 (5th Cir.2000) (*per curiam*) (unpublished) (concluding that the ALJ applied the *Stone* standard, where the ALJ found Landfried's mental condition was not severe because it "constituted only a minimal limitation on her ability to perform work activities"); *Joubert v. Astrue*, 287 Fed.Appx. 380, 382 (5th Cir.2008)

(*per curiam*) (unpublished) (applying *Stone* standard to conclude that "[s]ubstantial evidence supports the ALJ's decision that Joubert's hypertension, chest pain, and back pain did not impose more than a slight limitation on her ability to perform basic work-related activities").

**20.** *See, e.g., Gutierrez v. Barnhart*, 2005 WL 1994289, at *4 (5th Cir.2005) (*per curiam*) (unpublished) ("An impairment or combination of impairments is severe if it has more than minimal effect on the claimant's physical or mental ability to do basic work activities" (citing, among others, *Stone*, 752 F.2d 1099)).

ta's mental impairment was not severe. Further, with regard to the *Stone* presumption for a remand, because the ALJ applied the correct standard, his failure to expressly reference *Stone* or another court opinion of the same effect does not require a remand.[21] *See Hampton v. Bowen,* 785 F.2d 1308, 1311 (5th Cir.1986) (*"Stone* does not require a wholesale remand of all severity cases. A case will not be remanded simply because the ALJ did not use 'magic words.' We remand only where there is no indication the ALJ applied the correct standard.").

## 2. Plaintiff's Claim That Substantial Evidence Does Not Support the ALJ's Finding That Her Mental Impairment Was Not Severe

■ Acosta argues broadly (and vaguely) that the ALJ's determination that Acosta's mental impairment of depressive disorder was not severe lacks support by substantial evidence. Specifically, however, she takes issue only with the ALJ's subsidiary findings that he made en route to his ultimate non-severity determination.

The first appearance of depression in the record is in a psychiatric evaluation report from El Paso Mental Health and Mental Retardation ("MHMR"), where Acosta sporadically sought treatment for depression between December 2004 and May 2006. Psychiatrist Nicolas Baida–Fragoso, M.D., of MHMR conducted that evaluation. He diagnosed her with Major[22] Depressive Disorder, Single Episode; prescribed her Amitriptyline, an antidepressant medication she had been taking for the prior five years for her migraine; and recommended a treatment plan with goals to decrease her depression and anxiety, and increase her coping skills. R. 274, 276, 279. Acosta, however, stopped visiting MHMR.[23] R. 202. In January 2006, she returned for treatment and was seen by MHMR psychiatrists including Dr. Fragoso on a monthly basis until May 2006. During this period, Dr. Fragoso prescribed her Lexapro, an antidepressant medication, in combination with other medications including Amitriptyline, Trazodone, or Depakote. R. 272. Acosta responded to the medications with "mild" and "partial" (defined as 50–75%) improvements. R. 202, 201, 198, 195, 192. On a scale of 0–10 with 5 being "moderate," her depression was rated at 6–7 on January 10, 2006, but at 3 on May 6, 2006—the last time she

---

**21.** Arguably, the ALJ set forth "the correct standard ... by reference to ... another [opinion] of the same effect." *Stone,* 752 F.2d at 1106. This is because the Administration's rulings, which the ALJ cited in support of his standard, have binding effect on ALJs, *see Spellman v. Shalala,* 1 F.3d 357, 361 n. 7 (5th Cir.1993) ("Social Security Rulings are 'binding on all components of the Administration. These rulings represent precedent final opinions and orders and statements of policy and interpretations that have been adopted by the Administration.' " (quoting 20 C.F.R. § 422.406(b)(1) (1991) [now 20 C.F.R. § 402.35(b)(1)])), and consequently, constitute another opinion "of the same effect." *Stone,* 752 F.2d at 1106. Moreover, as discussed *supra,* in promulgating its minimal effect standard, the Administration expressly referenced *Estran* and *Stone* in SSR 85–28.

Accordingly, the ALJ's citation to SSR 85–28 can be said to incorporate by reference that ruling's reference to *Estran* and *Stone,* thus conceivably satisfying *Stone's* directive for a reference to that opinion or another of the same effect.

**22.** *See Hammond v. Barnhart,* 124 Fed.Appx. 847, 853 n. 14 (5th Cir.2005) (unpublished) ("The word 'major' in 'major depressive disorder' is a medical term and does not, in and of itself, require us to consider the disorder 'severe' within the meaning of the law.").

**23.** The record contains no treatment or progress report from MHMR for the period between December 2004 and January 2006, but indicates that she stopped visiting MHMR sometime in March 2005. R. 202.

visited a psychiatrist at MHMR. R. 203, 192, 188. Her Global Assessment Functioning ("GAF")[24] scores varied from a low of 43 to a high of 60.[25] R. 198, 204. In March 2007, she was discharged due to non-attendance. R. 183.

In September 2006, Acosta began to see neurologist Albert C. Cuetter, M.D., at Texas Tech University Health and Science Center (TTUHSC). The record contains six treatment notes by Dr. Cuetter, the last of which is dated June 16, 2009. Although at TTUHSC, Acosta was being "followed because of migraine," R. 444, Dr. Cuetter's notes contain some information relating to her depression. He diagnosed her with Major Depressive Disorder. R. 301. So far as appears, she was prescribed antidepressants primarily to treat her migraine headaches.[26] Most often, she was prescribed Elavil (i.e., Amitriptyline) as a migraine prophylaxis. R. 301,446. Often she was prescribed Zoloft (i.e., Sertraline) in addition to Elavil. R. 296. During her last visit in June 2009, Dr. Cuetter discontinued Elavil and prescribed Zoloft. R. 443.

The record also contains psychological examination reports by two non-treating physicians. Psychologist James W. Schutte, Ph.D., conducted a consultative psychological examination of Acosta on May 27, 2008, at the behest of the state disability agency. Dr. Schutte reported the results of DSM–IV–TR diagnoses as follows:

Axis I: 296.22 Major Depressive Disorder

Axis II: 799.9 Diagnosis Deferred on This Axis

Axis III: Reported hypothyroidism, hearing loss, migraines, hypertension

Axis IV: None reported

Axis V: Current GAF: 60

R. 381. He also administered the Wechsler Adult Intelligence Scale Ill's (WAIS–III) Digit Span subtest—which measures an examinee's working memory, attention, and concentration.[27] On that test, she scored in the extremely low range corresponding to a scaled score of 3. R. 380. Dr. Schutte, however, questioned the accu-

24. The GAF is a subjective determination based on a scale of 1 to 100 of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 32 (Text Revision 4th ed.2000); *Boyd v. Apfel*, 239 F.3d 698, 701 n. 2 (5th Cir.2001).

25. A GAF score of 41–50 reflects "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)." *Diagnostic & Statistical Manual of Mental Disorders, supra,* 34. A GAF score of 51–60 reflects "[m]oderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR any moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers)." *Id.*

26. Mayo Clinic, *Migraine: Treatments and Drugs,* http://www.mayoclinic.com/health/migraineheadache/DS00120/DSECTION= treatments-and-drugs (last visited Feb. 6, 2012) ("Certain antidepressants are good at helping to prevent some types of headaches, including migraines.").

27. *See* Charles J. Golden, Patricia Espe–Pfeifer, & Jana Wachsler–Felder, *Neuropsychological Interpretations of Objective Psychological Tests* 183 (2000) ("While initially [the Digit Span] scale was considered a measure of attention and concentration as well as verbal memory, the WAIS–III conceives of the test as a measure of working memory."); Jianjun Zhu & Larry Weiss, *The Wechsler Scales, in Contemporary Intellectual Assessment: Theories, Tests, and Issues* 297, 305 (Dawn P. Flanagan & Patti L. Harrison eds., 2005) (Digit Span measures "auditory short-term memory, sequencing skills, attention, and concentration.").

racy of the test result, as he remarked, "her performance was unusually low." R. 381.

Psychologist Javier Carrillo, Ph.D., conducted the other psychological examination on July 24, 2008, though at the request not of the state disability agency, but of the Texas Department of Assistive and Rehabilitation Services, where Acosta sought assistance to find employment. Dr. Carrillo administered a Wide Range Achievement Test–4, on which Acosta scored in the low to lower extreme ranges. R. 438. Apparently, however, the test was administered in English[28]; so, to reduce the impact of her lack of familiarity with English, Dr. Carrillo administered Comprehensive Test of Nonverbal Intelligence (CTONI). R. 439. On CTONI, Acosta received an IQ score of 62, which Dr. Carrillo described as "consistent with an extremely low range of intellectual functioning." *Id.* Dr. Carrillo concluded that she did not have learning disorders in the areas of reading, writing, and mathematics, but based on her IQ score, diagnosed her with borderline intellectual functioning. R. 440. Dr. Carrillo reported the DSM–IV–TR diagnostics as follows:

Axis I: 311 Depressive Disorder Not Otherwise Specified

Axis II: V62.89 Borderline Intellectual Functioning

Axis III: 799.9 Deferred to medical records

Axis IV: Vocational uncertainty, problems with the social environment

Axis V: Current GAF: 80

R. 440.

The ALJ accepted these diagnoses by these medical experts and determined that Acosta had a medically determinable mental impairment of depressive disorder. The ALJ next reviewed the record evidence under the agency's "special technique" for determining the severity of mental impairments. Pursuant to 20 C.F.R. § 404.1520a(d)(1)[29] and citing relevant evidence for support,[30] the ALJ made the following subsidiary findings about her limitations in four broad functional areas: she had "mild" limitations in the areas of daily living; social functioning; and concentration, persistence, or pace; and "no" episodes of decompensation of extended duration. R. 22. On appeal here, Acosta complains that substantial evidence does not support the ALJ's finding that Acosta had no more than mild limitations in the areas of social functioning and consistence, persistence, or pace. Pl.'s Br. 4. She insists that evidence supports a finding of "moderate" limitations in these two areas. *Id.*

"Social functioning refers to [a claimant's] capacity to interact independently,

---

**28.** Acosta testified that she cannot "speak, converse in the English language." R. 32.

**29.** *See supra* note 6.

**30.** Acosta insists that the ALJ did not consider Dr. Schutte's psychological examination report. Pl.'s Br. 5. To be sure, the ALJ expressly referenced medical records from MHMR and TTUHSC, and Dr. Carrillo's psychological examination report, but he did not cite to Dr. Schutte's report. That, however, does not mean that he did not consider Dr. Schutte's report. *See Castillo v. Barnhart,* 151 Fed. Appx. 334, 335 (5th Cir.2005) *(per curiam )*

(unpublished) ("That the ALJ did not specifically cite each and every piece of medical evidence considered does not establish an actual failure to consider the evidence." (citing *Falco v. Shalala,* 27 F.3d 160, 163 (5th Cir. 1994))); *Brunson v. Astrue,* 387 Fed.Appx. 459, 461 (5th Cir.2010) *(per curiam )* (unpublished) ("The fact that the ALJ cited certain evidence that he felt supported his decision does not mean that he failed to consider all of the other evidence in the record."). To the contrary, the ALJ stated that he considered "the entire record." R. 20.

appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C(2). It includes "the ability to get along with others, such as family members, friends, neighbors, grocery clerks, landlords, or bus drivers." *Id.* "The abilit[ies] to get along, communicate clearly, and cooperate with others are examples of strengths in social functioning." *Parks v. Comm'r of Soc. Sec.*, 401 Fed.Appx. 651, 654 (3d Cir.2010) (unpublished) (citing 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C(2)). Conversely, "a history of altercations, evictions, firings, fear of strangers, avoidance of interpersonal relationships, or social isolation" may demonstrate weakness in social functioning. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C(2).

The Court's review of the record reveals that there is substantial evidence supporting the ALJ's finding of mild limitation in social functioning. In a form entitled "Function Report—Adult," and submitted by Acosta at the administrative level, she denied having difficulty getting along with family, friends, neighbors, or others, and denied having problems in getting along with authority figures, such as bosses, police, landlords, or teachers. R. 161–62. During her psychological examination by Dr. Schutte, she also "denied having any trouble getting along with others at work." R. 379. Dr. Fragoso consistently described her as cooperative and polite. R. 193, 196, 199, 202, 277. Dr. Schutte also described her as courteous and cooperative. R. 380, 436. Specifically, Dr. Carrillo noted: "Rapport was easily established since she was both courteous and coopera-

tive." R. 436. Significantly, Dr. Carrillo opined that Acosta exhibited "adequate social skills" and that "[t]hese skills will be an asset as she pursues employment and possibly further training." R. 440.

Acosta, however, directs the Court's attention to a 2006 treatment note by Dr. Fragoso and contends that she is "irritable and cannot tolerate criticism," and that she has been fired from jobs in the past due to her inability to tolerate criticism. Pl.'s Br. 5. Read closely, the note reveals that Acosta's "irritability" was a side effect of Depakote,[31] a medication Dr. Fragoso had prescribed during her prior visit, but discontinued upon her complaint of feeling irritable. R. 193, 194, 197. Dr. Fragoso's notation does, however, indicate that Acosta reported that she "has been fired from jobs [because] she cannot tolerate criticism."[32] R. 193. To be sure, Dr. Schutte spotted that reference in Dr. Fragoso's note. R. 380 ("Available medical records . . . note the claimant has been fired from jobs because she cannot tolerate criticism."). However, nothing in the record recounts or bears out her narrative of getting fired or the reasons therefor. To the contrary, in the "Function Report—Adult" form, she denied having ever being fired or laid off from a job because of problems in getting along with other people. R. 162. The ALJ appears to have discredited that statement she made to Dr. Fragoso, as he expressed skepticism about the information she provided regarding her employment history. R. 22–23. Accordingly, this Court must defer to the ALJ's credibility determination. *See Burch v. Barnhart,* 400 F.3d 676, 680–81

---

31. *See also* Mayo Clinic, *Valporic Acid: Side Effects,* http://www.mayoclinic.com/health/drug-information/DR602951/DSECTION=side-effects (last visited Feb. 6, 2012) (listing irritability as one of the side effects of Depakote).

32. So far as appears, at the time she made that specific comment to Dr. Fragoso, she had not worked since July 2004, when Thermotech, her employer of eight or nine years, closed the plant where she was employed and she was laid off. R. 32, 131.

(9th Cir.2005) (stating, in a case where the ALJ interpreted evidence in the context of making a credibility determination, "we must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation" (brackets, internal quotation marks, and citation omitted)).

"Concentration, persistence, or pace," on the other hand, refers to "the ability to sustain focused attention sufficiently long to permit the timely completion of tasks commonly found in work settings." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C(3). Further, "[l]imitations in concentration, persistence, or pace are best observed in work settings, but may also be reflected by limitations in other settings." *Id.* "[M]ajor limitations in this area can often be assessed through clinical examination or psychological testing"; "[i]n psychological tests of intelligence or memory, concentration is assessed through tasks requiring short-term memory or through tasks that must be completed within established time limits." 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00C(3).

Dr. Fragoso consistently assessed Acosta's cognition as "grossly intact" and judgment as "good." R. 276, 202, 199, 196, 193. During her 2004 visit to MHMR, Dr. Fragoso assessed her as having "fair" recent, remote, and immediate memory, but short attention span. R. 276. Upon Acosta's return to MHMR in 2006, Dr. Fragoso noted decreased attention and concentration, and rated her concentration at 2 on a scale of 0–3. R. 201. 202. On her subsequent visits, however, he rated her concentration at 1. R. 198, 195, 192. Dr. Cuetter most often reported her memory as "normal"/"intact"; only on one occasion he noted decreased short-term memory. *Compare* R. 442, 292, 295, 300, *with* R. 445. He also assessed her attention more often as "normal"/"intact" than as "decreased."

*Compare* R. 442, 292, 295, *with* R. 445, 413. Dr. Schutte opined that Acosta's cognitive functions seemed grossly intact, but her ability to reason seemed mildly impaired due to depression. R. 380–81. As noted, he administered a WAIS–III digit span test, but questioned the accuracy of her performance on that test. He, however, remarked that Acosta's attention and concentration appeared within normal limits during the evaluation, and her long-term memory did not seem grossly impaired. R. 380. Dr. Carrillo did not make any specific statement about her concentration and attention.

On appeal here, Acosta points out that Dr. Carrillo assessed her with borderline intellectual functioning. Pl.'s Br. 6 (citing R. 440). Dr. Carrillo, however, did not suggest that her borderline intellectual functioning limited her ability to work. Although borderline intellectual functioning may suggest some, even moderate, difficulty in concentration, persistence, or pace, *see, e.g., Fisher v. Barnhart,* 181 Fed.Appx. 359, 364 (4th Cir.2006) (*per curiam*) (unpublished) (noting approvingly that the ALJ's finding of moderate difficulty in the area of concentration, persistence, or pace accounted for the claimant's borderline intellectual functioning), it does not, without more, require a finding of more than a mild limitation in that functional area. *See, e.g., Harris v. Comm'r of Soc. Sec.,* 330 Fed.Appx. 813, 815–16 (11th Cir.2009) (*per curiam*) (unpublished) (affirming the ALJ's decision to deny disability benefits where the ALJ found that the claimant, who was diagnosed with borderline intellectual functioning, had mild limitations in the area of concentration, persistence, or pace).

Acosta calls the Court's attention to a few pieces of evidence to buttress her argument that the ALJ erred by not finding at least moderate limitations in the area of

concentration, persistence, or pace. She points to a February 10, 2006 treatment note where Dr. Fragoso noted that Acosta had decreased attention and concentration. Pl.'s Br. 4 (citing R. 202). As mentioned above, on that day, Dr. Fragoso rated her concentration at 2 on a scale of 0–3, but during her subsequent visits at 1. Likewise, she points out that in his treatment note dated September 16, 2008, Dr. Cuetter stated that Acosta had decreased attention and short-term memory. Pl.'s Br. 4 (citing R. 445). She again overlooks that Dr. Cuetter assessed her attention and memory more often as "normal"/"intact." Acosta's reliance on a single assessment of her functional ability made at a specific time in isolation from other assessments made *over time* contravenes the regulatory principles guiding the assessment of functional limitations. The regulations make plain that because an individual's level of functioning may vary over time, the overall functional effects of an individual's impairment must be considered "longitudinally"—i.e., over time. *See* 20 C.F.R. § 404.1520a(c)(1) ("Assessment of functional limitations is a complex ... process that requires us to consider multiple issues and all relevant evidence to obtain a longitudinal picture of your overall degree of functional limitation."); 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00D(2) ("Your level of functioning may vary considerably over time.... Proper evaluation of your impairment(s) must take into account any variations in the level of your functioning in arriving at a determination of severity over time."). *See also* 65 Fed.Reg. 50751 (Aug. 21, 2000) ("[F]unctioning at a specific time—regardless of whether it is adequate or poor—may not be an accurate indicator of the overall severity of the individual's impairment(s).").

The Court is of the opinion that although snippets of the doctors' notes present some conflicting evidence, the medical records, read holistically and longitudinally, provide substantial evidence in support of the ALJ's finding that Acosta had no more than mild limitations in the functional area of concentration, persistence, or pace. *See Zimmerman v. Astrue,* 288 Fed.Appx. 931, 937 (5th Cir.2008) *(per curiam )* (unpublished) (noting that the record contained some conflicting evidence, but finding that the ALJ's conclusion about the claimant's mental impairment was supported by substantial evidence); *Menchaca v. Barnhart,* 179 Fed.Appx. 215, 216 (5th Cir.2006) *(per curiam )* (unpublished) ("[I]f the Commissioner's conclusion is supported by substantial evidence, we must affirm it, even in the face of conflicting evidence.").

Moreover, Mark Boulos, M.D., a non-examining, state agency psychological consultant, who reviewed the record evidence, including the medical records, and completed a Psychiatric Review Technique form ("PRTF"), opined, like the ALJ, that Acosta had mild limitations in the areas of activities of daily living, social functioning, and concentration, persistence, or pace, and "no" episodes of decompensation of extended duration. R. 395. He determined that Acosta's depressive disorder (more precisely, her affective disorder) was not severe. R. 385. Another state agency psychological consultant, Henry Henna, Ph.D., who reviewed Dr. Boulos's PRTF, concurred with his opinions. R. 406. These opinions provide substantial evidence in support of the ALJ's findings, including those challenged by Acosta here. *See Villa v. Sullivan,* 895 F.2d 1019, 1024 (5th Cir.1990) (stating a non-examining physician's assessments provide substantial evidence upon which the ALJ may properly rely where these assessments are based upon medical evidence and are not contradicted by those of an examining physician).

In sum, the Court concludes that the ALJ's findings of mild limitations in the areas of social functioning and concentration, persistence, or pace are supported by substantial evidence. Further, the Court has also reviewed the ALJ's other subsidiary findings under 20 C.F.R. § 404.1520a(d)(1)—which findings are not challenged by Acosta—and finds that they too have the support of substantial evidence in the record.

As a final matter, under § 404.1520a(d)(1), the ALJ was required to make a broader inquiry: whether the evidence otherwise indicated that "there is more than a minimal limitation in [her] ability to do basic work activities." 20 C.F.R. § 404.1520a(d)(1). To that end, the ALJ noted that Dr. Carrillo assessed a GAF score of 80, which indicates that Acosta's symptoms "are transient and expectable reactions to psycho-social stressors" and that she has "no more than slight impairment in social, occupational, or school functioning." Am. Psychiatric Ass'n, *Diagnostic & Statistical Manual of Mental Disorders* 34 (Text Revision 4th ed.2000); *Kohler v. Astrue*, 546 F.3d 260, 262 n. 1 (2d Cir.2008). Dr. Schutte assessed a GAF score of 60, which is one point away from the next range on the scale which indicates that an individual has "some mild symptoms ... or some difficulty in social, occupational, or school functioning," but that she is "generally functioning pretty well." *Diagnostic & Statistical Manual of Mental Disorders, supra,* 34. Significantly, and as the ALJ noted, Dr. Carrillo opined: "Ms. Acosta's symptoms of depression are not so severe so as to render her incapable of working if she desires to work. In my opinion if she

were to find employment that she enjoyed this would help in decreasing her symptoms of depression." R. 440. From this opinion, in light of the evidence discussed above and Acosta's recent GAF scores within the alleged disability period, the ALJ could reasonably conclude that Acosta's "mental impairment of depressive disorder does not cause more than minimal limitations in [her] ability to perform basic mental work activities and therefore is not severe." R. 21. The ALJ, therefore, possessed substantial evidence to form the basis of his ultimate finding that Acosta's depression was not severe.

Accordingly, Acosta has failed to establish that the ALJ committed a legal error at Step Two of the sequential evaluation process or that the ALJ's assessment of her depressive disorder is unsupported by substantial evidence.

**B. The ALJ's Finding That Plaintiff Had the RFC to Perform a Full Range of Medium Work**

*1. Plaintiff's Claim That the ALJ Erred by Failing to Include in His RFC Finding All Limitations Supported by Evidence*

 The ALJ determined that Acosta had "the residual functional capacity to perform the full range of medium work as defined in 20 C.F.R. § 404.1567(c)." R. 22. The ALJ concluded that consistent with that RFC, Acosta was capable of performing her past relevant work as a machine operator. R. 23. Acosta avers that the RFC finding is unsupported by substantial evidence because it fails to expressly include nonexertional [33] limitations arising from her depression, hearing loss, hypertension, migraine headaches, and medi-

---

**33.** "Nonexertional limitations" affect a person's ability to meet the non-strength demands of a job. 20 C.F.R. § 404.1569a(c). Examples of nonexertional limitations include difficulty in seeing or hearing and difficulty in performing the nonexertional aspects of work-related activities due to pain. *Id.*

cation side effects. Pl.'s Br. 8–9, 11. She does not, however, present her rendition of the RFC formulation incorporating limitations that, she alleges, the ALJ omitted in his formulation, nor does she explain how the omitted limitations render her incapable of performing her past relevant work as a machine operator. Instead, she simply contends that the ALJ's "faulty RFC finding taint[ed] all remaining findings in the sequential evaluation." *Id.* at 11.

■ RFC is an assessment of the most an individual can do despite the limitations that stem from her medically determinable impairments, including those that are not severe. SSR 96–8p, 1996 WL 374184, at *2, *5 (S.S.A.1996); 20 C.F.R. § 404.1545(e). In making that assessment, an ALJ must consider *all* functional limitations—exertional and nonexertional. SSR 96–8p, 1996 WL 374184, at *5. The limitations arising from the medication side effects are a factor to be considered. *Id.;* SSR 96–7P, 1996 WL 374186, at *3 (S.S.A.1996); 20 C.F.R. § 404.1529(c)(3)(iv); *see also Crowley v. Apfel,* 197 F.3d 194, 199 (5th Cir.1999) (holding the ALJ's failure to consider the adverse side effects of medications was an error). Further, the RFC assessment must include a narrative discussion describing how the evidence supports each conclusion and "a resolution of any inconsistencies in the evidence." *Myers v. Apfel,* 238 F.3d 617, 620 (5th Cir.2001) (*per curiam* ) (citation omitted); SSR 96–8p, 1996 WL 374184, at *7. At bottom, however, RFC determinations are "inherently intertwined with matters of credibility," *Outlaw v. Astrue,* 412 Fed.Appx. 894, 897 (7th Cir.2011) (unpublished), and the ALJ's

credibility determinations are generally entitled to great deference. *Newton v. Apfel,* 209 F.3d 448, 459 (5th Cir.2000).

Turning to her specific arguments, Acosta contends that the ALJ erred by not incorporating in his RFC formulation her "mild" limitations in the functional areas of activities of daily living, social functioning, and concentration, persistence, or pace. Pl.'s Br. 8. The ALJ made those findings in his Step Two analysis, where he concluded that Acosta's depressive disorder was not severe. The ALJ, however, considered these findings in assessing her RFC, as he stated, "the following residual functional capacity assessment reflects the degree of limitation the undersigned has found in the 'paragraph B'[34] mental function analysis." R. 22. *See Hackett v. Barnhart,* 395 F.3d 1168, 1173 (10th Cir. 2005) ("[O]ur general practice, which we see no reason to depart from here, is to take a lower tribunal at its word when it declares that it has considered a matter."). Further, the ALJ specifically discussed evidence relating to her depression. R. 23. Moreover, he stated that he accorded significant weight to the opinion of consultative examining psychologist Dr. Carrillo, who opined that Acosta's depressive disorder was "not so severe as to render her incapable of working." R. 21, 23, 440. A reasonable mind could accept Dr. Carrillo's opinion as adequate to support the conclusion that Acosta's mild limitations in the functional areas of activities of daily living, social functioning, and concentration, persistence, or pace do not preclude her from performing the full range of medium work.

■ At the administrative level, Acosta asserted that she was unable to work due

---

**34.** "Paragraph B" criteria refer to the degree of functional limitations resulting from an individual's mental disorders in four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. Part 404, Subpart P, Appendix 1, § 12.00 *et seq.;* 20 C.F.R. § 404.1520a(c)(3).

to her hearing loss and hypertension. R. 123. The ALJ concluded, based on substantial evidence, that her "hearing is much improved with hearing aids and her hypertension is stable." R. 23. According to a May 2008 audiology study, Acosta has moderate to severe sensorial hearing loss in both of her ears, with "good" speech discrimination. R. 326. However, with the use of hearing aids, her hearing loss is only mild and her speech discrimination is "excellent." R. 327. Acosta wears hearing aid devices. R. 33, 300. For her hypertension, she takes Norvasc and Atenolol, R. 446, 299, and her physicians consistently regarded her blood pressure as well-controlled or stable on medications. R. 291, 337, 446, 419, 411. An impairment that can be reasonably remedied or controlled by medication or treatment is not disabling and does not affect RFC. *Johnson v. Bowen*, 864 F.2d 340, 348 (5th Cir. 1988) (*per curiam*); *Hernandez v. Shalala*, 41 F.3d 665, 1994 WL 685062, at *3 (5th Cir.1994) (*per curiam*) (unpublished) (concluding "Hernandez's ... diabetes, obesity, high cholesterol, and headaches[ ] were controlled through treatment, diet, and medication, and thus did not affect her RFC" and holding substantial evidence supported the ALJ's finding that Hernandez had the RFC for sedentary work); 20 C.F.R. § 404.1530(a).

Before the ALJ, Acosta testified that due to her migraine, she was unable to perform her old job as a machine operator. R. 36. The treatment notes from her neurologist indicate that Acosta has been suffering from migraine since she was thirty-five years of age. R. 299. She was diagnosed with migraine with no aura or pro-

drome. R. 299. Her migraine causes hemicranial pulsatile pains. R. 299, 444. She complained of having migraine headaches three times per week in late 2006, but every day in early 2007. R. 294, 299. These headaches are precipitated by stress and certain foods. R. 294. Her neurologist also noted that her headaches were premenstrual. R. 291, 299. Her migraine also produces associated symptoms of nausea and vomiting. R. 299–300. Acosta reported that her nausea is relieved by taking Excedrin every day. R. 294. As for headaches, her doctors prescribed her Amitriptyline (i.e. Elavil) as a prophylactic medicine. R. 301, 446. Although on occasions her doctors altered her medications and prescribed her Sertraline (i.e., Zoloft) in lieu of Amitriptyline, R. 293, 443, the record reveals that she has most consistently taken Amitriptyline for many years, since as early as 1999.[35] R. 176, 259, 274. During her June 20, 2007 visit with Dr. Cuetter, Acosta reported that "Amitriptyline prevents headache." R. 291. However, during her most recent visits, subsequent to filing her application for disability benefits, she reported that she received "[n]o help in the past by prophylactic medicine" and complained of having daily headaches. R. 441, 444. Her neurologist remarked that "Atenolol and Amitriptyline are supposed to prevent the headaches" and recommended that a Magnetic Resonance Imaging (MRI) of her brain be taken apparently to rule out alternate causes for her headaches.[36] R. 444, 446. As of the time of the ALJ's hearing, no MRI was taken. R. 20.

Acosta also complained that the side effects from her medications were disabling

---

**35.** Dr. Fragoso's note dated December 21, 2004, indicates that Acosta was treated by Dr. Jose Ramirez, a neurologist, for her migraine headaches and she had been taking Amitriptyline for five years. R. 274; *see also* R. 299.

**36.** A Computerized Tomography (CT) scan of Acosta's head performed in May 2006 was considered to be "within normal limits." R. 299.

and averred that she was dismissed from jobs because of the side effects. R. 38, 141. She testified that her medications were too strong. R. 38. So far as appears, and as the ALJ noted, she was referring to Lexapro, an antidepressant medication she took during the early part of 2006, but not any longer. R. 21, 438. The ALJ also noted that she might have some degree of rebound headache from Amitriptyline. R. 23. Acosta further testified that her "feet swell a lot" due to the medications she takes. R. 36. During her June 20, 2007 visit with Dr. Cuetter, she reported that Amitriptyline "produces swelling of legs." [37] R. 291. Acosta, however, failed to present objective evidence to show how these side effects affect her residual capacity or prevent her from working.

Quite the contrary, the ALJ noted that despite her complaints of disabling migraine headaches and medication side effects, Acosta has worked in temporary jobs and now works full time, thirty to forty hours per week. R. 21, 23. An ALJ must assess residual functional capacity based on the relevant evidence in the record, which includes "reports of daily activities" and "evidence from attempts to work." SSR 96–8p, 1996 WL 374184, at *5; *Williams–Overstreet v. Astrue*, 364 Fed. Appx. 271, 276–77 (7th Cir.2010) (unpublished). Moreover, continued employment during the alleged disability period supports a finding of non-disability. *Vaughan v. Shalala*, 58 F.3d 129, 131 (5th Cir.1995) (*per curiam*). Acosta, however, counters that her present job, which she began in March 2009 with the help from Texas Department of Assistive and Rehabilitation

Services, R. 34, 177, is a "sheltered" work activity, because, as she testified, "if I'm not feeling well, they allow me to go home," R. 36, and consequently, should not be considered to show her ability to perform substantial gainful activity. Pl.'s Br. 9–10 (citing 20 C.F.R. § 404.1573(c)). Other evidence in the record, however, shows that she held at least one other job during the period of purported disability. Specifically, as noted by the ALJ, she related to Dr. Carrillo that she worked for Allegiance Staffing (a temporary work agency) from April 2008 to June 2008. R. 437. Further, during the consultative examination conducted by Dr. Schutte on May 27, 2008, she reported that she was "working for the past three weeks for a temp service, and indicated that her job was going 'OK.'" R. 379. Acosta does not claim that this job too was a sheltered job, nor did she mention this job at the administrative level.

▮ Moreover, her job history reflects that prior to her alleged disability onset date, she held multiple jobs including her past relevant work as a machine operator at Thermotech,[38] despite suffering from migraine headaches and medication side effects. R. 23, 131, 437. Her doctors' treatment notes reveal that she experienced the same side effects prior to her alleged disability onset date as she did at the time of the ALJ's hearing. *E.g.*, R. 291 (swelling of legs). Likewise, she reported having daily headaches recently just as she did in 2007. *Compare* R. 441, *with* R. 294. Furthermore, although she alleged that her conditions deteriorated recently, R. 151, 175, there is no objective

---

**37.** *See also* Mayo Clinic, *Amitriptyline (Oral Route): Side Effects,* http://www.mayoclinic.com/health/drug-information/DR602731/DSECTION=side-effects (last visited Feb. 6, 2012) (listing "swelling of face, ankles, or hands" as side effects of Amitriptyline).

**38.** Treatment notes from Acosta's doctors reflect that she began to experience migraine headaches sometime in 1995 after she had turned thirty-five years old, R. 299, and she worked at Thermotech between August 1996 and July 2004. R. 131.

medical evidence that her headaches or her medication side effects have worsened. "A condition that was not disabling during working years and has not worsened cannot be used to prove present disability." *Martise v. Astrue,* 641 F.3d 909, 924 (8th Cir.2011) (brackets, internal quotation marks, and citation omitted).

In summary, the ALJ considered her subjective complaints about "the intensity, persistence, and limiting effects" of her depressive disorder, hearing loss, hypertension, migraine, and medication side effects, but found that they "are not credible to the extent they are inconsistent with the above residual functional capacity assessment." R. 23. Put another way, the ALJ determined that they did not restrict her ability to work as much as she claimed and that she could perform the full range of medium work. Because the Court finds that the ALJ's credibility determination is supported by substantial evidence, it will not disturb those findings. *See Villa v. Sullivan,* 895 F.2d 1019, 1024 (5th Cir. 1990) ("[A] factfinder's evaluation of the credibility of subjective complaints is entitled to judicial deference if supported by substantial record evidence."). Accordingly, the Court holds that the ALJ did not err by failing to incorporate additional limitations, as argued by Acosta, into his RFC formulation. The ALJ needed only to include those limitations that he accepted as credible and that were supported by evidence. *See Masterson v. Barnhart,* 309 F.3d 267, 273 (5th Cir.2002). *See also Outlaw v. Astrue,* 412 Fed.Appx. 894, 898 (7th Cir.2011) (unpublished) ("The ALJ needed only to include limitations in his RFC determination that were supported by the medical evidence and that the ALJ found to be credible." (citing *Simila v. Astrue,* 573 F.3d 503, 520–21 (7th Cir. 2009))); *Elletson v. Astrue,* 319 Fed.Appx. 621, 623 (9th Cir.2009) (unpublished) ("In crafting an RFC determination, an ALJ

'must only include those limitations supported by substantial evidence.' " (quoting *Robbins v. Soc. Sec. Admin.,* 466 F.3d 880, 886 (9th Cir.2006))).

**2. *Plaintiff's Claim That the ALJ Committed a Legal Error by Not Making a Specific Finding Regarding Her Ability to Sustain Employment***

As her final issue on this appeal, Acosta maintains that she cannot sustain employment. Pl.'s Br. 10. Pointing out that the ALJ acknowledged her allegations of "chronic daily headache with periods of no headaches whatsoever," Pl.'s Br. 10 (citing R. 20), Acosta explains that her impairments (presumably migraine) are of waxing and waning nature. *Id.* Therefore, the ALJ, she complains, erred by failing to make a specific finding regarding her ability to *sustain* employment. For support, Acosta relies on *Singletary v. Bowen,* 798 F.2d 818 (5th Cir.1986), and *Watson v. Barnhart,* 288 F.3d 212 (5th Cir.2002).

Under *Singletary,* ALJs are required to determine whether a claimant is capable of not only obtaining, but also *maintaining* employment. *Singletary,* 798 F.2d at 822 ("A finding that a claimant is able to engage in substantial gainful activity requires more than a simple determination that the claimant can find employment and that he can physically perform certain jobs; it also requires a determination that the claimant can *hold* whatever job he finds for a significant period of time." (emphasis in original)). Such a specific finding is required in "a situation in which, by its nature, the claimant's physical ailment waxes and wanes in its manifestation of disabling symptoms." *Frank v. Barnhart,* 326 F.3d 618, 619 (5th Cir.2003) (*per curiam*). The Fifth Circuit in *Watson,* a progeny of *Singletary,* gave an example of such a situation as where a claimant's "back pain prevented him from maintain-

ing employment (e.g., because every number of weeks he was in too much pain to work)." *Watson,* 288 F.3d at 218.

However, the *Singletary–Watson* requirements have been whittled down to some extent by our appellate court's more recent cases. *See Perez v. Barnhart,* 415 F.3d 457, 465 (5th Cir.2005). In *Frank,* the Court of Appeals made plain that "nothing in *Watson* suggests that the ALJ must make a specific finding regarding the claimant's ability to maintain employment in every case." *Frank,* 326 F.3d at 619. Noting that "[u]sually, the issue of whether the claimant can maintain employment for a significant period of time will be subsumed in the analysis regarding the claimant's ability to obtain employment," the *Frank* court explained that a separate consideration of whether the claimant is capable of maintaining employment is required on rare occasions where "the claimant's intermittently recurring symptoms [are] of sufficient frequency or severity [so as] to prevent the claimant from holding a job for a significant period of time." *Id.*

In assessing Acosta's RFC, the ALJ considered her "migraines of varying frequency." R. 23. In the "Applicable Law" section of his decision, the ALJ stated that RFC is the claimant's ability to do physical and mental work activities "on a sustained basis" despite limitations from her impairments and cited 20 C.F.R. § 404.1545, the regulation describing RFC, as well as SSR 96–8p, both of which make clear that RFC is a measure of the claimant's capacity to perform work "on a regular and continuing basis." R. 20. Nothing in the record indicates that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC. Moreover, Acosta presented no evidence to show that her intermittently recurring headaches prevented her from holding a job for long periods of time or that she "could work temporarily at a particular level of exertion but could not sustain work at that level." *See Castillo v. Barnhart,* 151 Fed.Appx. 334, 336 (5th Cir.2005) (*per curiam* ) (unpublished). Absent such evidence, the ALJ was not required to make a specific finding on whether Acosta can maintain employment. *See Dunbar v. Barnhart,* 330 F.3d 670, 672 (5th Cir.2003) ("[A]bsent evidence that a claimant's ability to maintain employment would be compromised despite his ability to perform employment as an initial matter, or an indication that the ALJ did not appreciate that an ability to perform work on a regular and continuing basis is inherent in the definition of RFC, we do not read *Watson* to require a specific finding that the claimant can maintain employment."). The Court therefore concludes that the ALJ's failure to make such a specific finding was not an error.

Accordingly, Acosta has failed to establish that in assessing her RFC, the ALJ committed a legal error or that the ALJ's assessment of her RFC lacks support by substantial evidence.

## V. CONCLUSION

Based on the forgoing, **IT IS HEREBY ORDERED** that the decision of the Commissioner is **AFFIRMED.**

A separate judgment in accordance with this Memorandum Opinion and Order will issue this date.